UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| NEXT GAMING, LLC, | Case No. 2:14-cv-00071-MMD-CWH |
| Plaintiff, | |
| v. | ORDER GRANTING PLAINTFF'S MOTION FOR DEFAULT JUDGMENT (ECF No. 28) |
| GLOBAL GAMING GROUP, INC., a/k/a G3 and ATLANTIC CITY COIN & SLOT SERVICE COMPANY, a/k/a ACS, | |
| Defendants. | |

I.    **SUMMARY**

Before the Court is Plaintiff Next Gaming's Motion for Default Judgment ("Motion"). (ECF No. 28.) Defendant Atlantic City Coin & Slot Service Company ("ACS" or "Defendant") has not responded to the Motion. For the reasons stated below, the Motion is granted in part.

II.    **FACTUAL BACKGROUND**

This case arises from the dealings between three parties. Plaintiff, a Nevada limited liability company, negotiated a deal with Global Gaming Group ("G3") whereby Plaintiff could license from G3, among other things, games previously licensed to ACS, a Nevada corporation. (ECF No. 1 ¶¶ 4, 5, 15.) Through its communications with G3, Plaintiff learned that ACS may be receptive to a buyout by Plaintiff. (*Id.* ¶ 16.) Plaintiff reached out to ACS to discuss acquisition of ACS's intellectual property, including but

not limited to, a gaming platform called the Axcess platform or Monster Video Platform, which G3 had been developing for ACS. (*Id.* ¶¶ 17, 20.)

Plaintiff entered into a contractual agreement ("Asset Purchase Agreement") with ACS on April 13, 2013, to purchase all of ACS's assets (ECF No. 28-2). In exchange for the purchase price of $110,000.00, the parties agreed for Plaintiff to receive all of ACS's assets, including "Axcess-related Intangible Personal Property," which was to include the Axcess platform itself, as well as "all 'Axcess' platform related patents and patent rights . . . computer programs (including source codes) and related documentation, technical information, manufacturing, engineering and technical drawings, know-how and all pending applications for and registrations of patents, trademarks, service marks and copyrights . . . and all goodwill associated with the use of the Intellectual Property[.]" (*Id.* at 3)

Plaintiff paid ACS the purchase price of $110,000.00, believing it had acquired complete rightful ownership of the Axcess platform. (ECF No. 1 ¶¶ 22, 31, 34.) Plaintiff carried on negotiations with G3 about entering into a direct licensing agreement for G3's games. (*Id.* ¶ 33.) However, relations between G3 and Plaintiff deteriorated when, among other reasons, the Axcess platform and other games which Plaintiff was working to license from G3 failed to obtain approval from an independent testing laboratory prior to showcasing at the 2013 Global Gaming Expo ("G2E") to gaming companies. (*Id.* ¶¶ 69-77.)

On November 21, 2013, G3 and its affiliation Global Gaming Group — Asia ("G-3A") sent Plaintiff a letter notifying Plaintiff that ACS and G-3A were co-owners of the Axcess Platform pursuant to their own Platform Agreement, and that ACS had no right to sell or grant an exclusive license to the Axcess Platform. (*Id.* ¶ 98.) This was contrary to assertions made by ACS in its Asset Purchase Agreement with Plaintiff, in which ACS represented to Plaintiff that ACS owned Axcess platform outright and was not licensing it from another party. (*Id.* ¶¶ 30, 100.) Plaintiff further learned through a letter from G3 to ///

ACS dated January 10, 2013, that ACS was no longer in business and had terminated its employees. (*Id.* ¶ 102.)

As a result, Plaintiff reached out to former Executive Vice President and General Counsel of ACS, Tom McCormick, who represented that ACS was no longer in business and that several lawsuits were pending against ACS, but ACS was not defending them. (*Id.* ¶ 103.) McCormick further represented that defaults were being taken, and that the company was waiting to be dissolved once it does not pay its annual corporate fees and taxes. (*Id.*)

Plaintiff filed suit against G3 and ACS seeking a declaration that Plaintiff is the rightful owner of the Axcess platform and associated games. (*Id.* ¶ 104.) Plaintiff alleges six causes of action against ACS: (1) breach of contract, (2) unjust enrichment, (3) breach of covenant of good faith and fair dealing, (4) fraudulent inducement, (5) misrepresentation, and (6) violation of Nevada's deceptive trade practices law.

Plaintiff asserts thirteen causes of action against G3: (1) breach of contract, (2) breach of covenant of good faith and fair dealing, (3) fraudulent inducement, (4) misrepresentation, (5) violation of Nevada's deceptive trade practices law, (6) violation of 15 U.S.C. § 1125(a), (7) Nevada's unfair competition law, (8) intentional interference with contract, (9) promissory estoppel, (10) fraudulent inducement regarding G2E, (11) conversion, (12) declaratory judgment, and (13) injunctive relief.

## III.   PROCEDURAL HISTORY

Plaintiff filed the Complaint on January 15, 2014, against G3 and ACS. (ECF No. 1.) Plaintiff served G3 with summons on January 16, 2014, and served ACS with summons on January 21, 2014. (ECF Nos. 8, 9.) Plaintiff and G3 settled out of court. (ECF No. 30.) On September 29, 2014, Plaintiff voluntarily dismissed G3 from the lawsuit with prejudice. (ECF No. 24.)

ACS never answered the Complaint or otherwise appeared. On October 20, 2014, Plaintiff requested entry of default against ACS, which the Clerk's Office entered on October 22, 2014. (ECF Nos. 25, 26.)

1  Plaintiff now moves for default judgment against ACS, seeking damages in the
2  amount of $250,000.00 and attorneys' fees and costs in the amount of $23,908.00. (ECF
3  No. 28.) ACS has not filed a response to the Motion.

4  **III.   LEGAL STANDARD**

5  Obtaining a default judgment is a two-step process governed by Rule 55 of the
6  Federal Rules of Civil Procedure. *Eitel v. McCool,* 782 F.2d 1470, 1471 (9th Cir. 1986).
7  First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed
8  to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk
9  must enter the party's default." Fed. R. Civ. P. 55(a). Second, after the clerk enters
10  default, a party must seek entry of default judgment under Rule 55(b).

11  Upon entry of default, the court takes the factual allegations in the non-defaulting
12  party's complaint as true, except for allegations regarding damages. *TeleVideo Sys., Inc.*
13  *v. Heidenthal,* 826 F.2d 915, 917–18 (9th Cir. 1987) (per curiam) (quoting *Geddes v.*
14  *United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)). But the "entry of default does not
15  entitle the non-defaulting party to a default judgment as a matter of right." *Warner Bros.*
16  *Entm't Inc. v. Caridi,* 346 F. Supp. 2d 1068, 1071 (C.D. Cal. 2004) (quoting *Valley Oak*
17  *Credit Union v. Villegas* (*In re Villegas*), 132 B.R. 742, 746 n.5 (B.A.P. 9th Cir.))
18  (alteration omitted). Instead, whether a court will grant a default judgment is in the court's
19  discretion. *Id.*

20  The Ninth Circuit has identified the following factors as relevant to the exercise of
21  a court's discretion in determining whether to grant default judgment: (1) the possibility of
22  prejudice to the plaintiff, (2) the merits of the plaintiff's substantive claims, (3) the
23  sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the
24  possibility of a dispute concerning material facts, (6) whether the default was due to the
25  excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil
26  Procedure favoring decisions on the merits. *Eitel*, 782 F.2d at 1471–72.

27  ///
28  ///

4

## IV.    DISCUSSION

### A.    Procedural Requirements

Plaintiff has satisfied the procedural requirements for default judgment. Pursuant to Rule 55(a), the Clerk properly entered a default against Defendant. Because Defendant has neither answered or otherwise responded to the Complaint, the notice requirement of Rule 55(b)(2) is not implicated. Thus, there is no procedural impediment to entering a default judgment.

### B.    *Eitel* Factors

#### 1.    Possibility of Prejudice

The first *Eitel* factor "considers whether the plaintiff will suffer prejudice if default judgment is not entered." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (S.D. Cal. 2002). Defendant has not made an appearance, answered, or otherwise responded to the Complaint. If Plaintiff's Motion is not granted, Plaintiff will likely be without other recourse for recovery. Due to Defendant's refusal to appear in this action, the possibility of prejudice to Plaintiff in the absence of default judgment is great. Thus, this *Eitel* factor weighs in favor of entering default judgment.

#### 2.    Substantive Merits and Sufficiency of the Complaint

The second and third *Eitel* factors favor a default judgment where the complaint sufficiently states a claim for relief under the "liberal pleading standards embodied in Rule 8" of the Federal Rules of Civil Procedure. *Danning v. Lavine*, 572 F.2d 1386, 1389 (9th Cir. 1978); *see* Fed. R. Civ. P. 8. Here, Plaintiff asserts several claims against ACS, but acknowledges that many were pled in the alternative to its breach of contract claim or would serve to recoup the same damages as its breach of contract claim. As a result, Plaintiff's argument focuses solely on its breach of contract claim.

A "plaintiff in a breach of contract claim must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Saini v. Int'l Game Tech*., 434 F. Supp. 2d 913, 919-20 (D. Nev. 2006). Here, the Plaintiff has (1) provided the Asset Purchase Agreement signed by both parties on April 10, 2013

1    (ECF No. 28-2.), (2) alleges that Defendant breached the contract by failing to deliver to

2    Plaintiff the Axcess Platform (ECF No. 1 ¶ 75.), and (3) that Plaintiff has suffered as a

3    result of Defendant's failure to deliver the Axcess Platform because Plaintiff has had to

4    pay for a replacement platform. (*Id.* ¶¶ 112-117.)

5         Since Plaintiff has sufficiently pleaded a claim for breach of contract, the second

6    and third *Eitel* factors weigh in favor of default judgment.

7              **3.**      **Sum of Money at Stake**

8         In assessing the fourth factor, the Court considers "the amount of money

9    requested in relation to the seriousness of the defendant's conduct, whether large sums

10    of money are involved, and whether 'the recovery sought is proportional to the harm

11    caused by [the] defendant's conduct.'" *Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d

12    1200, 1212 (W.D. Wash. 2014) (quoting *Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725

13    F. Supp. 2d 916, 921 (N.D. Cal. 2010).

14         Here, Plaintiff seeks to recover the $250,000.00 it has contracted to pay for a

15    replacement platform. "The fundamental principle that underlies the availability of

16    contract damages is that of compensation." 24 Williston on Contracts § 64:1 (4th ed.

17    2014). The goal is to place the plaintiff "in as good a position as he or she would have

18    occupied had the defendant-promisor not breached the contract," and this "is done by

19    awarding him or her a sum of money sufficient to enable him or her to obtain the

20    promised performance from another party." *Id.* Because Plaintiff's damages appear to be

21    reasonable and proportionate to the harm suffered, this *Eitel* factor weighs in favor of

22    default judgment.

23              **4.**      **Possible Dispute of Material Facts**

24         The fifth factor "considers the possibility of dispute regarding any material facts in

25    the case." *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177. "Upon entry of default, all well-

26    pleaded facts in the complaint are taken as true, except those relating to damages." *Id.*

27    Because Defendant has failed to appear or submit any controverting evidence, the Court

28    accepts Plaintiff's well-pleaded factual allegations as true. There is, accordingly, little

possibility of dispute over the material facts, and this factor weighs in favor of default judgment.

### 5.    Excusable Neglect

This factor "considers the possibility that the default resulted from excusable neglect." *Id*. Defendant properly received service on January 21, 2014, which is nine months before the Clerk's Entry of Default on October 22, 2014. (ECF. No. 26.) Given the time period during which Defendant had notice of the action against it and in which Defendant failed to answer or otherwise respond to the Complaint, it is unlikely that Defendant failed to respond due to excusable neglect. *See Produce Alliance*, 2013 WL 129428, at *4 (concluding that defendants' failure to respond was likely not from excusable neglect where defendants received service nearly two months before the clerk's entry of default).

Furthermore, Plaintiff reached out to former Executive Vice President and General Counsel of ACS, Tom McCormick, in November 2013. (ECF No. 1 ¶ 103.) Mr. McCormick represented that ACS was no longer in business and that several lawsuits were pending against ACS, but ACS was not defending them. *Id.* McCormick further represented that defaults were being taken, and that the company was waiting to be dissolved. *Id.* Thus, Defendant has made a conscious decision not to defend against pending lawsuits. The resulting failure to respond to the Complaint is not due to excusable neglect. This factor therefore weighs in favor of default judgment.

### 6.    Decision on the Merits

The seventh *Eitel* factor reflects a strong preference for deciding cases on their merits whenever reasonably possible. *See Eitel*, 782 F.2d at 1472. "However, the mere existence of [Rule 55(b)] indicates that 'this preference, standing alone, is not dispositive." *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177 (citing *Kloepping v. Fireman's Fund*, No. C 94-2684 TEH, 1996 WL 75314, at *3 (N.D. Cal. Feb. 13, 1996)). Although a decision on the merits is desirable, Defendant's failure to appear and to respond to the

///

7

1    Complaint renders such a decision "impractical, if not impossible." *Id.* Thus, this factor

2    will not preclude the Court from entering default judgment against Defendant.

3        Taken together, the *Eitel* factors weigh in favor of default judgment. The Court will

4    therefore grant default judgment.

5        **D.    Attorney's Fees and Costs**

6        Plaintiff also seeks $23,908.00 in attorneys' fees and costs incurred in pursuing

7    the action against Defendant. The Asset Purchase Agreement provides that the

8    prevailing party in a suit rising out of the Agreement will be entitled to reasonable

9    attorney fees and costs from the opposing party. (ECF No. 28-2 at 12.)

10       Reasonable attorney's fees are based on the "lodestar" calculation set forth in

11   *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). *See Fischer v. SJB-P.D., Inc.*, 214 F.3d

12   1115, 1119 (9th Cir. 2000). The court must first determine a reasonable fee by

13   multiplying "the number of hours reasonably expended on the litigation" by "a reasonable

14   hourly rate." *Hensley*, 461 U.S. at 433. Next, the court decides whether to adjust the

15   lodestar calculation based on an evaluation of the factors articulated in *Kerr v. Screen*

16   *Extras Guild*, Inc., 526 F.2d 67, 70 (9th Cir. 1975), which have not been subsumed in the

17   lodestar calculation. *See Fischer*, 214 F.3d at 1119 (citation omitted).

18       The factors the Ninth Circuit set forth in *Kerr* are:

19       (1) the time and labor required, (2) the novelty and difficulty of the
         questions involved, (3) the skill requisite to perform the legal service
20       properly, (4) the preclusion of other employment by the attorney due to
         acceptance of the case, (5) the customary fee, (6) whether the fee is fixed
21       or contingent, (7) time limitations imposed by the client or the
         circumstances, (8) the amount involved and the results obtained, (9) the
22       experience, reputation, and ability of the attorneys, (10) the "undesirability"
         of the case, (11) the nature and length of the professional relationship with
23       the client, and (12) awards in similar cases.

24   *Kerr*, 526 F.2d at 70. Factors one through five are subsumed in the lodestar calculation.

25   *See Morales v. City of San Rafael*, 96 F.3d 359, 364 n. 9 (9th Cir. 1996). Further, the

26   sixth factor, whether the fee is fixed or contingent, *may not* be considered in the lodestar

27   calculation. *See Davis v. City & Cnty. of S.F.*, 976 F.2d 1536, 1549 (9th Cir. 1992),

28   *vacated in part on other grounds*, 984 F.2d 345 (9th Cir. 1993). Once calculated, the

1  "lodestar" is presumptively reasonable. *See Pennsylvania v. Delaware Valley Citizens'*
2  *Council for Clean Air*, 483 U.S. 711, 728 (1987). Finally, only in "rare and exceptional
3  cases" should a court adjust the lodestar figure. *Van Gerwen v. Guarantee Mut. Life Co.*,
4  214 F.3d 1041, 1045 (9th Cir. 2000) (internal quotations omitted). *See also Fischer*, 214
5  F.3d at 1119 n. 4 (stating that the lodestar figure should only be adjusted in rare and
6  exceptional cases).

7  ### 1.    Reasonable Hourly Rate

8  Courts consider the experience, skill, and reputation of the attorney requesting
9  fees when determining the reasonableness of an hourly rate. *Webb v. Ada County*, 285
10  F.3d 829, 840 & n.6 (9th Cir. 2002). A reasonable hourly rate should reflect the
11  prevailing market rates of attorneys practicing in the forum community for "similar
12  services by lawyers of reasonably comparable skill, experience and reputation." *See id.*;
13  *see also Blum v. Stenson*, 465 U.S. 886, 895-96 n.11 (1984). To inform and assist the
14  court in the exercise of its discretion, "[t]he party seeking an award of fees should submit
15  evidence supporting the . . . rates claimed." *Hensley v. Eckerhart*, 461 U.S. 424, 433
16  (1983); *see also Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1263 (9th Cir. 1987).

17  Plaintiff seeks, and has submitted an affidavit to support, hourly rates of $350 for
18  a partner, $465 for a specialist, and $255 for an associate. Plaintiff additionally seeks
19  rates of $155 and $205 for two paralegals. (ECT No. 28 at 11; ECF No. 28-4.)

20  The Court finds the rates charged by the attorneys to be reasonable and within
21  the prevailing rates for the Las Vegas legal market. However, the $205 per hour rate
22  proposed for one of the paralegals is well above the rate courts in this district have
23  identified for Las Vegas paralegals. *See Boliba v. Camping World, Inc*., No. 2:14-CV-
24  01840-JAD, 2015 WL 5089808, at *4 (D. Nev. Aug. 27, 2015) (granting fees at $125 per
25  hour); *Tallman v. CPS Sec. (USA), Inc*., 23 F. Supp. 3d 1249, 1259 (D. Nev. 2014)
26  (granting fees at $90 per hour). Further, it is unclear from the time sheets (ECF No. 28-5)
27  why the heightened rate was justified or required. The Court will therefore grant fees for
28  both paralegals at the same rate of $155 per hour.

### 2.   Reasonable Hours Expended

In addition to evidence supporting the rates claimed, "[t]he party seeking an award of fees should submit evidence supporting the hours worked." *Hensley*, 461 U.S. at 433. "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* "The district court also should exclude from this initial fee calculation hours that were 'not reasonably expended'." *Id.* at 433-34 (citation omitted). "In other words, the court has discretion to 'trim fat' from, or otherwise reduce, the number of hours claimed to have been spent on the case." *Edwards v. Nat'l Business Factors*, Inc., 897 F. Supp. 458, 460 (D. Nev. 1995) (quotation omitted); *see also Gates v. Deukmejian*, 987 F.2d 1392, 1399 (9th Cir. 1992).

Based on the affidavits and timesheets provided by Plaintiff (ECF No. 28-4; ECF No. 28-5; ECF No. 29), attorneys and paralegals spend 74.5 hours on the case against ACS.[1] The Court finds this to be a reasonable amount of hours in relation to a case of this nature. Plaintiffs request for attorneys' fees is therefore granted in the amount of $21,185.25 (which is $150 less than the amount they requested, due the Court's adjustment of the paralegal fees).

### 3.   Costs

Plaintiff seeks $2,602.75 in costs incurred through filing fees, PACER fees, Westlaw charges, and investigative costs. (ECF No. 28-5.) The Court finds these costs reasonable and reimbursable.

## V.   CONCLUSION

It is therefore ordered that Plaintiff Next Gaming's Motion for Default Judgment (ECF No. 28) is granted. The request for attorney's fees is granted in the amount of $21,185.25 and costs in the amount of $2,602.75. The Clerk is directed to enter

///

---

[1]Plaintiff has provided an affidavit from Christopher Jorgensen explaining that, in calculating hours spend on the case against ACS, Plaintiff separated time spent on portions of the case that involved other defendants. (ECF No. 28-4) Plaintiff's time sheets clearly indicates which portions are and are not being counted toward their calculation of fees against ACS. (ECF No. 28-5.)

judgment in Plaintiff's favor and against Defendant Atlantic City Coin & Slot Service Company in accordance with this Order.

DATED THIS 13th day of July 2016.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

11